**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Indictment |
| | : | No. 2:11-CR-0026-RWS-SSC |
| | : | |
| DOUGLAS E. PERRY, JR. | : | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

Before the court are Defendant's Motion to Suppress Evidence and Statements [Doc. 26] and Motion to Suppress Statements [Doc. 27]. For the reasons that follow, it is **RECOMMENDED** that Defendant's motions be **DENIED**.

## Procedural History

In a superseding indictment filed August 2, 2011 [Doc. 19], Defendant was charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On August 18, 2011, Defendant filed the pending motions to suppress [Docs. 26 & 27], seeking to suppress evidence seized by law enforcement officers on June 14, 2011 during a traffic stop and statements made by Defendant on June 14, 2011 and June 16, 2011.

The court conducted a hearing on Defendant's motions to suppress on September 28, 2011 (see Doc. 32), and a transcript of that hearing was filed on October 13, 2011 [Doc. 34]. Defendant then filed a post-hearing brief [Doc. 35], the Government filed a brief in response [Doc. 36], and Defendant filed a reply [Doc. 41].

# **Findings of Fact**[1]

During the hearing on Defendant's motions to suppress, the Government presented the testimony of Casey Cope, a K-9 handler and Deputy Sheriff with the Lowndes County Sheriff's Office's Interstate Criminal Enforcement team[2] in Valdosta, Georgia (Tr. 5); Monty Sharitt, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (Tr. 73); and Neal Hinsley, a K-9 handler and Corporal with the Banks County, Georgia Sheriff's Office (Tr. 88).

At approximately 8:15 p.m. on June 14, 2011, Deputy Cope was working with Corporal Hinsley of Banks County in a joint traffic enforcement operation on Interstate 85 in Banks County, Georgia. (Tr. 10-11, 28-29, 93-94). They were in a marked Chevrolet Tahoe driven by Hinsley and parked in the median of the interstate, facing northbound traffic. (Tr. 11-12, 31, 94-95).[3] As Defendant's vehicle, a silver 2004 Porsche Cayenne with a New Jersey license plate, approached their location, the deputies observed that the vehicle, which was traveling in the left or "fast" lane, failed to maintain its lane of traffic, in violation of O.C.G.A. § 40-6-48, and "the vehicle actually veered toward the outside lane or the slow lane, completely coming outside of his lane of traffic." (Tr. 12, 14, 30-31,

---

[1] These facts are derived from the testimony and exhibits presented during the hearing on Defendant's motions to suppress. References to the transcript are designated as "Tr. __."

[2] The Interstate Criminal Enforcement team is a five-man unit that travels to other agencies in and out of the state, including Banks County, Georgia, to perform training and to conduct joint traffic enforcement operations. (Tr. 9-10).

[3] Corporal Hinsley had his dog with him, but Deputy Cope did not; the dog was not used in the traffic stop at issue. (Tr. 29, 67).

55, 95-96).

Following their observation of that violation, the deputies decided to make a traffic stop. (Tr. 13).[4] They pulled out of the median and traveled northbound, got behind the Porsche, began to monitor Defendant's driving and then observed a second violation when the Porsche moved into the right lane and thereafter traveled to the right side of its lane, "coming in contact with the fog line on the right side of the lane, the white line." (Tr. 13, 32, 47, 97). After Defendant moved into the right lane, Corporal Hinsley drove the Tahoe alongside Defendant's vehicle so that the deputies were able to see inside the vehicle. (Tr. 34-36). Deputy Cope observed Defendant, a black man with dreadlocks, driving the vehicle. (Tr. 55). The deputies did not immediately stop Defendant's vehicle after observing the initial failure to maintain lane because they wanted to determine how many occupants were in the vehicle and whether there were other observable infractions (such as failure to wear seatbelt or violation of open container laws), and they wanted to be sure they could stop the vehicle in a safe place. (Tr. 35-36, 70-71). After they observed the Porsche come into contact with the "fog line" on the right side of the road, i.e., the second violation, Corporal Hinsley activated his emergency equipment and pulled the vehicle over onto the right shoulder of the road. (Tr. 14, 37, 70, 97).

---

[4] A video recorder in Corporal Hinsley's vehicle recorded the traffic stop from approximately a minute before the emergency lights were activated (Tr. 94-95, 97; Def. Ex. 1), so the initial infraction was not recorded (Tr. 68). The sound quality of the recording varies at points due to the noise of the traffic and the fact that the officers, with the exception of Corporal Hinsley, did not wear a microphone. (See Tr. 68-69; Def. Ex. 1).

After the stop, Deputy Cope and Corporal Hinsley approached the Porsche on the passenger side and spoke with the driver, identified as Defendant, through the passenger-side window. (Tr. 14-15).[5] Deputy Cope asked Defendant "if there was any particular reason, if he had been drinking or [was] overly tired or any of those things that may contribute to his driving that [Cope] observed," and Defendant responded that he "was tired in fact, . . . he had come from Greek Week in Atlanta down there at Georgia Tech," and "he was going to actually go to the next available rest area or somewhere he could pull over and get some rest." (Tr. 15-16). Deputy Cope told Defendant he was asking those questions because Defendant failed to maintain his lane once he changed into the right lane. (Tr. 38, 44). Deputy Cope asked Defendant for his driver's license, registration and insurance card, and Defendant then opened the center console, revealing a tray containing a clear plastic baggy with a "green substance" inside. (Tr. 16, 98). Based on their training and experience and the way the substance was packaged, the deputies believed the substance to be marijuana. (Tr. 17, 98-99).

Defendant provided the requested documents to Deputy Cope, and Cope told him they were going to check his license status. (Tr. 18). Defendant remained seated in the Porsche, and Hinsley and Cope went to the rear of the vehicle where they discussed their observations of the baggy and their belief that it contained marijuana. (Tr. 18-20, 100). While Deputy Cope checked the license

---

[5] There were no other occupants of the car. (Tr. 14).

and vehicle status through the El Paso Intelligence Center ("EPIC"), Corporal Hinsley gave Defendant his insurance card and engaged him in "small talk" about where he was from, the weather, children, etc. (Tr. 19, 100). EPIC advised Cope that Defendant's license was valid and that Defendant was a convicted felon. (Tr. 19, 21, 66).[6] The deputies then called for back up and eventually other officers arrived, including a Georgia State Patrol trooper. (Tr. 21, 57, 101, 103).

Deputy Cope then drew his weapon, held it to his side, approached the passenger side of the Porsche and asked Defendant to exit the vehicle; Defendant exited the Porsche and walked to the rear of it where Cope, Hinsley and the state trooper were standing. (Def. Ex. 1; Tr. 21, 101-02). Cope told Defendant they were not going to give him a citation for "the infractions" but that "there was something [he] observed at the car that concerned [Cope], specifically the baggy." (Tr. 22). Deputy Cope told Defendant that he thought there was marijuana in the baggy, and Defendant "denied knowledge of it." (Id.). Deputy Cope then asked Defendant for permission to search the car and "asked him to be honest, if there was something in there [, Cope] needed to know about it"; Defendant responded that "there was nothing in the car" and gave Cope consent to search it. (Tr. 22, 65, 102). There is no evidence that Cope yelled at Defendant or threatened him to obtain his consent to search. (See Tr. 22-24, 102). Cope did not advise Defendant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966)

---

[6] Corporal Hinsley testified that he did not know that Defendant had a criminal history and did not know what Cope was told about Defendant's criminal history. (Tr. 106, 119).

before talking to him, nor did he tell Defendant that he had the right to refuse to consent. (Tr. 63, 65, 120).

The only officers present when Deputy Cope asked Defendant for his consent to search were Cope, Hinsley and the state patrol trooper; each was dressed in his department uniform, and each had a holstered weapon. (Tr. 23, 103-04, 120).[7] The only time Cope drew his weapon was when he approached the Porsche to ask Defendant to step out of it, and he reholstered his weapon by the time Defendant reached the rear of the Porsche. (Tr. 104). Defendant did not appear to be under the influence of alcohol or a controlled substance, and English appeared to be his primary language; the deputies did not have difficulty communicating with him, and he appeared to understand them and responded to their questions. (Tr. 24, 104-05).

After Defendant gave his consent, the deputies searched the vehicle. (Def. Ex. 1; Tr. 25-26, 105-06). The video shows that when the search began, Defendant remained standing and unrestrained while he talked with the state trooper. (Def. Ex. 1). The deputies found a pistol in the glove compartment. (Tr. 26, 106). After the pistol was found, Deputy Cope asked Defendant to sit on the ground for safety reasons, and he asked Defendant about the firearm. (Tr. 27; see also Def. Ex. 1). Defendant said that the firearm belonged to his uncle, that it was not his. (Tr. 27, 106-07). Cope did not advise Defendant of his Miranda

_____

[7] Other officers arrived later, making a total of six officers at the scene. (Tr. 57).

6

rights before he spoke with him. (Tr. 27, 66, 122). Cope had made the decision that he was going to arrest Defendant for possession of the marijuana, and Defendant was not free to leave, but Defendant was not handcuffed at that point, and Cope had not told Defendant that he was under arrest. (Tr. 27-28, 122).

The deputies also found a baggy of marijuana in the spare tire compartment. (Tr. 26). Corporal Hinsley had searched the console, but the baggy the deputies had seen previously was not in the console or any place else in the vehicle; Defendant later stated that he had put it in his sock. (Tr. 105). Defendant gave Corporal Hinsley consent to remove it from his sock. (Tr. 106).

Approximately 45 minutes after the stop began, Defendant was placed in a patrol car and transported to the local jail. (Tr. 67; Def. Ex. 1).

On June 16, 2011, ATF Special Agent Sharitt and ATF Agents Williams and Lee took custody of Defendant to press federal firearms charges against him, and they transported him from the Banks County Sheriff's Office to the Marshal's Service in Gainesville, Georgia. (Tr. 76-78, 84-86). No state charges had been filed against Defendant. (Tr. 77). The agents did not give Defendant <u>Miranda</u> warnings. (Tr. 78, 85). When the agents arrived to pick up Defendant, Defendant asked Agent Lee if he was with the Marshal's Service, and Lee told him he was with the ATF. (Tr. 79). Defendant asked Agent Sharitt what he was being charged with, and Sharitt told him that he was being charged with the same offense the ATF had previously charged him with, i.e., possession of a firearm by a convicted felon. (Tr. 79, 85-86). Defendant responded that he "knew [they] were coming."

(Tr. 79-80). This conversation took place outside the Sheriff's Office, before Defendant and the agents got into the car. (Tr. 80). The agents made no promises or threats to Defendant in exchange for a statement from him. (Id.).

During the drive to Gainesville, Defendant was handcuffed with a belly chain and wearing leg cuffs. (Tr. 81). Agent Lee drove, and Agent Sharitt sat in the back with Defendant. (Id.). Agent Sharitt did not ask Defendant any questions, but Defendant made incriminatory statements during the ride. (Tr. 81, 85). Agent Sharitt did not ask Defendant any follow-up questions in response to Defendant's statements; he simply made notes of Defendant's statements. (Tr. 81-82). At one point, Defendant asked Sharitt "if cooperators with the Government, snitches could remain basically anonymous, their identities could be concealed," and Sharitt responded, "Can't make any promises to any cooperators." (Tr. 82-83). Sharitt did not ask Defendant any questions about cooperating with the Government. (Tr. 83). At another point during the drive, Defendant talked about his uncle and the firearm, and Agent Lee asked Defendant if his uncle lived in Atlanta, but Defendant did not respond to that question—"He was busy talking about all of the other stuff he was discussing." (Id.).

## Legal Analysis and Conclusions of Law

### A.      Defendant's Motion to Suppress Evidence and Statements [Doc. 26]

Defendant argues that his seizure violated the Fourth Amendment because the deputies did not have reasonable suspicion or probable cause to justify the

traffic stop at issue, and therefore, all evidence seized after the initial stop and statements made during the stop must be suppressed. (See Doc. 26, Mot. at 1-2; Doc. 35, Def. Br. at 1-2). Defendant also argues that the warrantless search of his vehicle was not authorized by valid consent or probable cause. (Doc. 35, Def. Br. at 2).

### 1. **The Initial Stop**

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." United States v. Allen, 274 F. App'x 811, 817 (11th Cir. 2008) (unpublished decision) (citing Whren v. United States, 517 U.S. 806, 809-10 (1996)). "Such an automobile stop is reasonable and constitutional, however, if it is based on either probable cause to believe that a traffic violation has occurred or reasonable suspicion that a crime has been or will be committed." Allen, 274 F. App'x at 817-18 (citing United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003)). As Judge Murphy of this court has explained, "The propriety of the traffic stop . . . does not depend on whether the defendant is actually guilty of committing a traffic offense[, but r]ather, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed."

United States v. Crump, No. 4:10-CR-032-03-HLM, 2011 U.S. Dist. LEXIS 142363, at *15-16 (N.D. Ga. Dec. 12, 2011) (citing Chanthasouxat, 342 F.3d at 1277-79).

The undersigned finds that the deputies had probable cause to stop the vehicle Defendant was driving when they first observed that Defendant failed to maintain his lane, in violation of O.C.G.A. § 40-6-48.  The section provides in relevant part, "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this Code section, shall apply: (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  O.C.G.A. § 40-6-48(1).  Deputy Cope and Corporal Hinsley testified unequivocally that they observed, while they were parked on the median of Interstate 85 facing the interstate, that Defendant's Porsche did not maintain its lane as it approached their location.  (See Tr. 12, 30-31, 95-96).

Defendant contends, however, that the deputies should not be believed because, among other things, they gave inconsistent accounts of when they observed Defendant's vehicle fail to maintain its lane.  (Doc. 35, Def. Br. at 3, 7-8). Defendant asserts that Deputy Cope "testified that they observed the vehicle fail to maintain its lane when it 'passed' their location, (Tr- 12), while Officer Hinsley

twice stated that the vehicle failed to maintain its lane 'prior to it coming to us' (Tr- 95, 96)." (Id. at 8).

Deputy Cope testified:

When the vehicle approached our location and as it passed I noticed the vehicle, what we generally call failure to maintain its lane of traffic. Basically it was on the inside or what I call the fast lane. As it approached, as it passed our location, the vehicle actually veered toward the outside lane or the slow lane, completely coming outside of his lane of traffic to the point it aroused both mine and Corporal Hinsley's attention.

(Tr. 12). Corporal Hinsley testified:

As we are sitting watching northbound traffic come up 85, we are looking southbound to watch northbound traffic, and as we are looking that way we seen the vehicle failure to maintain its lane was riding in the left hand -- the hammer lane, the fast lane. It was riding in that lane, it[s] failure to maintain its lane prior to it coming to us, that is what caught our attention. . . . The vehicle started to come over toward the center of the roadway, the dash lines in the road in the middle of the road and then come back to it. And then as it was just before it was getting to us, it went ahead and switched lanes over to the right-hand lane.

(Tr. 95-96). The undersigned finds that Cope and Hinsley testified consistently and credibly about their observations, and any minor differences as to the precise moment each began to perceive the violation are immaterial.

Defendant also questions whether the deputies observed a violation while they were stationary in the median because when Deputy Cope explained to Defendant why the deputies pulled him over, Cope only made reference to the violation he perceived while the deputies were following Defendant on the

11

interstate, i.e., the second violation. (Doc. 35, Def. Br. at 9; <u>see also</u> Tr. 69).

Defendant's point is not persuasive. The fact that Deputy Cope referred to the more recent violation when he questioned Defendant about why he failed to maintain his lane does not indicate that the deputies did not observe an earlier violation that caused them to follow Defendant in order to make the stop.[8]

In addition, Defendant argues that "the questionable motives of the officers call into question whether there was probable cause to stop [him]." (Doc. 35, Def. Br. at 10). Defendant contends that the deputies "pulled alongside an expensive car with out of state plates, where they observed a black person with dreadlocks driving," and "[i]t was only at this point, they decided to slow down, change lanes so they were behind the vehicle, and initiate a traffic stop; only later claiming that they had probable cause based on an unsubstantiated traffic infraction." (<u>Id.</u> at 12). The undersigned finds Defendant's arguments misplaced. In the first place, as previously discussed, the undersigned finds that the deputies credibly testified that they observed Defendant's vehicle fail to maintain its lane as they were

---

[8] Defendant also asserts that Deputy Cope "also testified that he did not notice the second violation until he and Officer Hinsley were reviewing the dash camera video the day prior, in preparation for the suppression hearing," and contends that "[i]t is not possible for Officer Cope to inform [Defendant] about an alleged traffic violation that he was not aware of at the time of the stop." (Doc. 35, Def. Br. at 9). The undersigned understands Deputy Cope's testimony differently, i.e., his testimony was that when he reviewed the video recording prior to the hearing, he noticed that the second violation was captured on the recording (<u>see</u> Tr. 45), not that he first noticed the second violation when he reviewed the recording. He repeatedly testified that he saw Defendant's vehicle touch the right hand line or "fog line," and it was that infraction, i.e., the "second infraction," that he discussed with Defendant. (<u>See</u> Tr. 47-50, 69).

parked in the median of Interstate 85, and that they then decided to make a traffic stop of Defendant based on that violation. The undersigned further finds that Deputy Cope credibly explained why the deputies pulled up alongside the vehicle prior to making the traffic stop, i.e., in order to determine how many occupants were in the vehicle and whether there were any other observable violations. (Tr. 35-36, 71). These actions on the part of the deputies prior to effectuating the stop are reasonable safety measures and do not call into question their testimony that they had already observed a traffic violation when they entered onto the interstate to pursue Defendant's vehicle. "Moreover, under Whren, once [they] witnessed a violation of the state's traffic laws, [the deputies'] stop of [Defendant's] vehicle was appropriate regardless of any 'pretextual' motivations." United States v. Crump, No. 4-10-CR-032-HLM-WEJ, 2011 U.S. Dist. LEXIS 142778, at *15 (N.D. Ga. Nov. 21, 2011), adopted by 2011 U.S. Dist. LEXIS 142363.

Accordingly, the undersigned finds that the deputies had probable cause to stop Defendant. See, e.g., United States v. Garcia, 284 F. App'x 791, 793 (11th Cir. 2008) (unpublished decision) (finding that the defendant's failure to maintain his lane in violation of O.C.G.A. § 40-6-48(1) provided probable cause for the traffic stop); Crump, 2011 U.S. Dist. LEXIS 142363, at *16 (finding that probable cause existed for the traffic stop because the defendant's vehicle crossed over the lane lines); United States v. Griffin, No. 2:10-CR-016-RWS-SSC, 2010 U.S. Dist.

LEXIS 143280, at *16 (N.D. Ga. Sept. 7, 2010) (finding that probable cause existed to stop vehicle observed to be speeding and failing to maintain its lane), adopted by 2011 U.S. Dist. LEXIS 67981 (N.D. Ga. June 24, 2011).  Because the deputies had probable cause to stop Defendant's vehicle, that stop did not violate Defendant's Fourth Amendment rights.

## 2. The Search of Defendant's Vehicle[9]

"A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law." United States v. Campbell, 920 F.2d 793, 795 (11th Cir. 1991).  The burden is on the government to prove by a preponderance of the evidence that the warrantless search in this case was authorized.  "Upon a motion to suppress evidence garnered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution." United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted), cert. denied, 465 U.S. 1023 (1984).  "The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." Id.

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."

---

[9] Although it appears that the deputies also seized a baggy containing marijuana from Defendant's person, the parties do not address that seizure; they limit their discussion to the search of Defendant's vehicle.

United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). "The government bears the burden of proving the voluntariness of the consent." United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360. "[V]oluntariness is a question of fact to be determined from all the circumstances when evaluating the validity of a consent to a search." Id. at 358 (internal quotation marks and citation omitted); see also Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) ("[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."). The non-exclusive list of factors the court must consider in determining whether a consent was voluntary includes "[the] voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found." Chemaly, 741 F.2d at 1352 (quoting United States v. Phillips, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981), cert. denied, 457 U.S.1136 (1982)); see also United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996). In Gonzalez, the Eleventh Circuit explained that "the absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that 'where there is coercion, there cannot be consent.' " 71 F.3d at 828 (quoting

Bumper v. North Carolina, 391 U.S. 543, 550 (1968)).

Defendant argues that his "[c]onsent was not free and voluntary, and no person in [his] position would feel that they had the right to say no." (Doc. 35, Def. Br. at 15). Defendant points to several facts as evidence in support of his argument: (1) when he was asked to give his consent to search the Porsche, there were six officers on the scene; (2) Deputy Cope had drawn his weapon and asked Defendant to exit the Porsche; (3) Defendant "was escorted to the small gap between the rear of his vehicle and the front of Officer Hinsley's police vehicle where he was surrounded, addressed and questioned by three uniformed and armed officers—Officer Cope, Officer Hinsley, and a state trooper"; (4) the deputies had not returned his driver's license to him; (5) he was not free to leave; and (6) Defendant "was not told that he could refuse consent and was not given any Miranda warnings."[10] (Id. at 15-16). Defendant contends that "[a]ny response given by [him] was under duress and [was] mere acquiescence to a blatant show of police authority." (Id. at 16).

The undersigned finds that Defendant voluntarily gave his consent to the search. Both Deputy Cope and Corporal Hinsley credibly testified that Defendant gave his consent to search the Porsche.[11] Furthermore, the totality of the

[10] While Defendant asserts that "the total police presence" was six officers (Doc. 35, Def. Br. at 15-16), Corporal Hinsley credibly testified that, at the point Defendant was asked for consent to search the Porsche, only Hinsley, Cope and the state trooper were present. (Tr. 120).

[11] In his reply brief, Defendant asserts that "even though the dash camera is recording at this time, [his] alleged consent is not heard or seen on the videotape." (Doc. 41, Def. Reply at 4). Deputy Cope explained that he was not wearing a microphone (Tr. 68), and the undersigned notes that portions of conversations recorded on the videotape are not audible due to other noise that

circumstances indicates that Defendant's consent was voluntarily given and was not withdrawn during the stop. The deputies' testimony and the video show that the deputies spoke cordially with Defendant, they did not threaten or coerce Defendant, and Defendant did not object to the search or request that the search stop. Although Deputy Cope drew his weapon when he approached the Porsche to ask Defendant to exit it, Deputy Cope did not point the weapon at Defendant, and he re-holstered the weapon before talking to Defendant about searching the vehicle. Neither Hinsley nor the state trooper unholstered his weapon or pointed it at Defendant. In addition, although Defendant was not free to leave during the traffic stop, he was not restrained by handcuffs when he gave his consent. Under these circumstances, the undersigned finds that the search of the Porsche was authorized by voluntary consent, and thus, it was not unconstitutional.[12]

Because the traffic stop and search of Defendant's vehicle did not violate the Fourth Amendment, it is **RECOMMENDED** that Defendant's motion to suppress evidence seized from Defendant's vehicle on June 14, 2011 be **DENIED**.

### 3. Defendant's Statements

To the extent that Defendant moves to suppress any statements he made on June 14, 2011 on the ground that they were obtained as a result of a violation

---

occurred during the stop, particularly the noise of traffic traveling on the interstate. Thus, the fact that the video did not capture the audio portion of Deputy Cope's exchange with Defendant when he consented to search of the Porsche does not show that Defendant did not give his consent.

[12] Because the undersigned finds that the warrantless search of Defendant's vehicle was authorized by his consent, Defendant's alternative argument that the deputies did not have probable cause to search the vehicle (see Doc. 35, Def. Br. at 16-18) is not reached.

of his Fourth Amendment rights during the traffic stop on that date, it is **RECOMMENDED** that his motion be **DENIED** because no Fourth Amendment violation occurred.

## B. Defendant's Motion to Suppress Statements [Doc. 27]

In his Motion to Suppress Statements [Doc. 27], Defendant "moves this Court to suppress any and all statements made by him to federal agents and state law enforcement officers on or about June 14, 2011, June 16, 2011, or on any other occasion." (Doc. 27, Mot. at 1-2). He asserts that he "was in custody when he was questioned extensively by law enforcement officers in reference to the alleged offense," and that "[i]t is not at all clear that [he] knowingly and voluntarily waived his rights under Miranda v. Arizona, 384 U.S. 436 . . . (1966)." (Id.). Defendant also asserts that the Government must demonstrate that Defendant's statements were made freely and voluntarily pursuant to Jackson v. Denno, 378 U.S. 368 (1969). (Id. at 2).[13]  In his post-hearing brief [Doc. 35], however, Defendant did not address any Fifth Amendment issues related to his statements. Instead, he limited his discussion to the June 14, 2011 traffic stop and whether his Fourth Amendment rights were violated. (See Doc. 35). The Government pointed out this omission in its post-hearing brief (Doc. 36, Gov't Br. at 2 n.1), but Defendant did not address his statements in his reply (see Doc. 41).

Therefore, it appears that Defendant does not intend to pursue suppression

---

[13] Jackson and Miranda protect Fifth Amendment rights. Jarrell v. Balkcom, 735 F.2d 1242, 1251-52 (11th Cir. 1984), cert. denied, 471 U.S. 1103 (1985).

of his statements on Fifth Amendment grounds.  However, in an abundance of caution, the undersigned will  consider whether Defendant's statements were made in violation of the Fifth Amendment.

### 1.    June 14, 2011 Statements

"No person . . . shall  be  compelled  in  any  criminal  case  to  be  a witness  against himself . . . ."  U.S. Const. amend. V.  In Miranda, the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  The Court explained that "[b]y custodial  interrogation,"  it meant  "questioning  initiated  by  law  enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id.  Specifically, the safeguards that must be employed before a person in custody is interrogated include that he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him.  Id. at 467-73.

It is well-settled, however, that "[p]re-custodial questioning does not require Miranda warnings."  United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (original formatting altered) (citing United States v. Brown, 441 F.3d 1330, 1347-49 (11th Cir. 2006), cert. denied, 549 U.S. 1182 (2007)), cert. denied, 551 U.S.

1138 (2007). "A defendant is in custody for the purposes of <u>Miranda</u> when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" <u>Street</u>, 472 F.3d at 1309 (original formatting altered) (quoting <u>Brown</u>, 441 F.3d at 1347). In <u>Street</u>, the Eleventh Circuit explained that the definition of "custody" for <u>Miranda</u> purposes is not co-extensive with the definition of "seizure" for Fourth Amendment purposes:

> [A] seizure does not necessarily constitute custody for <u>Miranda</u> purposes. The standards are different. The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when a reasonable person would not feel free to terminate the encounter with the police. By contrast, a person is in "custody" for <u>Miranda</u> purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

<u>Street</u>, 472 F.3d at 1309-10 (internal citations and quotation marks omitted); <u>see also</u> <u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes." (citing <u>Street</u>, 472 F.3d at 1310)).

The court in <u>Street</u> explained further that the test for whether a person is "in custody" is a "totality of the circumstances determination," and it is objective, as viewed from the perspective of "a reasonable innocent person." <u>Id.</u> at 1309. Thus, "'the actual, subjective beliefs of the defendant and the interviewing officer

on whether the defendant was free to leave are irrelevant.' " Id. (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)). When applying this test, the court should consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.' " Street, 472 F.3d at 1309 (quoting United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989)).

It is undisputed that the deputies did not advise Defendant of his rights under Miranda before Defendant made statements to them. However, the undersigned finds that suppression of those statements is not required because Defendant was not in custody when he made statements on June 14, 2011. Defendant was not restrained or told that he was placed under arrest when the deputies spoke with him prior to the search of the Porsche or when they questioned him about the firearm found during the search of the Porsche. Although Deputy Cope drew his weapon when he approached Defendant's vehicle to ask him to step out of it, he did not point his weapon at Defendant, and he holstered it before he talked to him. Furthermore, even the act of drawing one's weapon or handcuffing a suspect does not necessarily transform an encounter into an arrest. See, e.g., United States v. Acosta, 363 F.3d 1141, 1147 (11th Cir. 2004) (explaining that "an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car" (internal citations omitted)); United States v. Blackman, 66 F.3d 1572, 1576 (11th

21

Cir. 1995) (stating that "the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory detention into an arrest"), <u>cert. denied</u>, 517 U.S. 1126 (1996). In addition, the video of the stop shows that the deputies did not threaten Defendant, but instead spoke with him in a cordial and professional manner (<u>see</u> Def. Ex. 1), and the stop occurred during daylight on a public highway. Accordingly, the undersigned finds that Defendant was not in custody for purposes of <u>Miranda</u> when he made statements to the deputies on June 14, 2011. <u>See, e.g.</u>, <u>United States v. Parker</u>, No. 1:10-CR-0176-JEC-JFK, 2010 U.S. Dist. LEXIS 133789, at *30-32 (N.D. Ga. Nov. 18, 2010) (finding that the defendant was not in custody for purposes of <u>Miranda</u> even though he was detained by officers who handcuffed him during an investigative detention and briefly drew their weapons because the defendant was told he was only being detained, the detective did not point his weapon at the defendant and holstered it before talking with the defendant, the detective's tone was "very laid back" and he did not yell at or threaten the defendant, and "the detention occurred in a public parking lot and was observed by civilians standing in the area"), <u>adopted by</u> 2010 U.S. Dist. LEXIS 133787 (N.D. Ga. Dec. 18, 2010). The court's conclusion about the stop in <u>Acosta</u> is applicable here:

> The stop did not involve the type of "highly intrusive" coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made. The totality of the circumstances were such that a reasonable person in [Defendant's] position would not have believed that he was utterly at that mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No *Miranda* warnings were required at the time.

<u>Parker</u>, 2010 U.S. Dist. LEXIS 133789, at *32-33 (quoting <u>Acosta</u>, 363 F.3d at 1150).

The undersigned also finds that Defendant's June 14, 2011 statements were made voluntarily.[14]  A statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." <u>Harris v. Dugger</u>, 874 F.2d 756, 761 (11th Cir.), <u>cert. denied</u>, 493 U.S. 1011 (1989).  "The determination of whether a confession is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice." <u>United States v. Jones</u>, 32 F.3d 1512, 1516 (11th Cir. 1994) (internal quotations omitted); <u>see also</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 285-88 (1991) (noting that voluntariness is determined by the totality of the circumstances). "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." <u>United States v. Lall</u>, 607 F.3d 1277, 1285 (11th Cir. 2010) (citing <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972)).  Here, there is no evidence that the deputies pointed their guns at Defendant, threatened him or exerted any improper influence in order to obtain his statements.

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress his June 14, 2011 statements on Fifth Amendment grounds be **DENIED**.

---

[14] When addressing a Fifth Amendment challenge to a statement, "[e]ven if a court finds compliance with *Miranda*, the court must still rule on the [statement's] voluntariness." <u>Jarrell</u>, 735 F.2d at 1252.

## 2.    <u>June 16, 2011 Statements</u>

The undersigned finds that Defendant was in custody on June 16, 2011 when he made statements to Agents Sharitt and Lee as they transported him from the Banks County Sheriff's Office to the Marshal's Service in Gainesville. Furthermore, it is uncontroverted that the agents did not read Defendant his <u>Miranda</u> rights before he made his statements.  However, suppression of those statements is not required because Defendant did not make the statements in response to interrogation by the agents.

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).   Agent Sharitt testified credibly that neither he nor Agent Lee questioned Defendant during their drive to Gainesville; rather, Defendant made unsolicited, spontaneous statements to them.[15]  There is no evidence that the agents made any statements or engaged in any actions "reasonably likely to elicit an incriminating response" from Defendant.  "Even in a custodial setting  .  .  .  , 'absent words or actions designed to elicit an incriminating response from a defendant, any statements made by the defendant are considered voluntary.' " <u>United States v. Bachynsky</u>, 415 F. App'x 167, 176 (11th Cir. 2011) (unpublished decision) (quoting <u>United States v. Otero</u>, No. 90-

---

[15] Agent Lee did ask Defendant where his uncle lived, but Defendant did not respond to that question.  (Tr. 83).

1839, 1990 U.S. App. LEXIS 18420, at *4 (7th Cir. Oct. 18, 1990), <u>cert. denied</u>, 498 U.S. 1124 (1991)).  The undersigned finds that Defendant's statements were made spontaneously and not in response to interrogation and thus <u>Miranda</u> warnings were not required.

The undersigned also finds that Defendant's statements were made voluntarily, i.e., they were "the product of [Defendant's] free and rational choice." <u>Jones</u>, 32 F.3d at 1516 (internal quotations omitted).  There is no evidence that the agents threatened or coerced Defendant or asserted any pressure on him to make statements to them.   therefore, no fifth Amendment violation occurred.

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress his June 16, 2011 statements on Fifth Amendment grounds be **DENIED**.

## Conclusion

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence and Statements [Doc. 26] and Motion to Suppress Statements [Doc. 27] be **DENIED**.

**IT IS FURTHER ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO REPORTED, RECOMMENDED, and ORDERED** this 19th day of January, 2012.

*Susan S. Cole*
SUSAN S. COLE
United States Magistrate Judge